**SCHARF-NORTON CENTER FOR CONSTITUTIONAL LITIGATION**
**GOLDWATER INSTITUTE**
Clint Bolick (Ariz. Bar No. 021684)
Diane S. Cohen (Ariz. Bar No. 027791)
Nicholas C. Dranias (Ariz. Bar No. 330033)
Gustavo E. Schneider (Ariz. Bar No. 027213)
500 E. Coronado Road
Phoenix, AZ 85004
P: (602) 462-5000 / F: (602) 256-7045
CBolick@GoldwaterInstitute.org
DCohen@GoldwaterInstitute.org
NDranias@GoldwaterInstitute.org
GSchneider@GoldwaterInstitute.org
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Nick Coons; U.S. Representatives Jeff Flake; Trent Franks; and John Shadegg; Speaker of the Arizona House of Representatives Kirk Adams; Arizona Senators Carolyn Allen; Sylvia Allen; Ron Gould; Chuck Gray; Linda Gray; Jack Harper; and John Nelson; Arizona Representatives Cecil Ash; Nancy Barto; Andrew Biggs; Judy Burges; Steve Court; David Gowan; Laurin Hendrix; Russell Jones; John Kavanagh; Lucy Mason; Steve Montenegro; Rick Murphy; Warde V. Nichols; Carl Seel; David Stevens; Andrew Tobin; Janson T. Vogt; James Weiers; Jerry Weiers; and Kimberly Yee,<br><br>                 Plaintiffs,<br><br>v.<br><br>Timothy Geithner, in his official capacity as Secretary of the United States Department | Civil Action No. _____<br><br><br><br>**CIVIL RIGHTS COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

of the Treasury; Kathleen Sebelius, in her )
official capacity as Secretary of the United )
States Department of Health and Human )
Services; Eric Holder, Jr., in his official )
capacity as Attorney General of the United )
States; and Barack Hussein Obama, in his )
official capacity as President of the )
United States, )
                                                    )
                                    Defendants.     )
_____ )

Plaintiffs Nick Coons; U.S. Representatives Jeff Flake, Trent Franks and

John Shadegg; Speaker of the Arizona House of Representatives Kirk Adams;

Arizona Senators Carolyn Allen, Sylvia Allen, Ron Gould, Chuck Gray, Linda

Gray, Jack Harper and John Nelson; Arizona Representatives Cecil Ash, Nancy

Barto, Andrew Biggs, Judy Burges, Steve Court, David Gowan, Laurin Hendrix,

Russell Jones, John Kavanagh, Debbie Lesko, Lucy Mason, Steve Montenegro,

Rick Murphy, Warde V. Nichols, Carl Seel, David Stevens, Andrew Tobin,

Janson T. Vogt, James Weiers, Jerry Weiers and Kimberly Yee (collectively

"Plaintiffs"), by and through their undersigned counsel, bring this Complaint

against the above-named Defendants, their employees, agents and successors in

office.  In support of this Complaint, Plaintiffs allege the following upon

information and belief:

## INTRODUCTION

1.  The federal government does not have the constitutional power to

mandate that Plaintiff Nick Coons and other American citizens purchase health

insurance, much less surrender their medical privacy and autonomy, as a condition of living in the United States.  Further, it is a violation of the letter and spirit of the United States Constitution to burden the legislative voting powers of Arizona state legislators, including Plaintiffs Adams, C. Allen, S. Allen, Gould, C. Gray, L. Gray, Harper, Nelson; Ash, Barto, Biggs, Burges, Court, Gowan, Hendrix, Jones, Kavanagh, Lesko, Mason, Montenegro, Murphy, Nichols, Seel, Stevens, Tobin, Vogt, Ja. Weiers, Je. Weiers, and Yee ("State Legislator Plaintiffs"), to coerce implementation of federal health care regulations.  Moreover, Congress has no constitutional power to delegate nearly unlimited legislative power to any federal executive branch agency, much less to entrench health care regulations against review, debate, revision or repeal by Plaintiffs Jeff Flake, Trent Franks and John Shadegg or any other elected U.S. Representative or Senator.

Such federal overreaching must be rejected if the principles of limited government and the separation of powers established by the United States Constitution mean anything.

2.  Accordingly, Plaintiffs request a declaration by this Court that the federal Patient Protection and Affordable Care Act of 2010 ("the Act"), H.R. 3590 and H.R. 4872, both facially and as applied to them, violates the United States Constitution.

**JURISDICTION AND VENUE**

3.  This Court has jurisdiction under 28 U.S.C. §§ 1331, 1340 and 1346(a)(2).

4.  This Court is authorized to grant declaratory and injunctive relief under 5 U.S.C. §§ 701 through 706, 28 U.S.C. §§ 2201 and 2202, Federal Rules of Civil Procedure 57 and 65, and by the general legal and equitable powers of the federal judiciary.

5.  Venue is proper under 28 U.S.C. § 1391(e)(2).

**PARTIES**

6.  Plaintiff Nick Coons is a United States citizen and a citizen of Arizona, residing in the city of Tempe, within the jurisdiction of this Court.  Plaintiff Coons does not have private health insurance, objects to being compelled by the federal government through the passage of the Act to purchase health care coverage and objects to being compelled to share his private medical history with third parties.

7.  Plaintiff Jeff Flake is an elected United States Representative for Congressional District 6 of the State of Arizona.  Plaintiff Flake objects to Congress exceeding its constitutional powers and burdening his voting rights as a Representative by delegating nearly unlimited legislative power to a federal agency in the executive branch and attempting to entrench federal health care regulations from congressional review or repeal through the passage of the Act.

8.  Plaintiff Trent Franks is an elected United States Representative for Congressional District 2 of the State of Arizona.  Plaintiff Franks objects to Congress exceeding its constitutional powers and burdening his voting rights as a representative by delegating nearly unlimited legislative power to a federal agency in the executive branch and attempting to entrench federal health care regulations from congressional review or repeal through the passage of the Act.

9.  Plaintiff John Shadegg is an elected United States Representative for Congressional District 3 of the State of Arizona.  Plaintiff Shadegg objects to Congress exceeding its constitutional powers and burdening his voting rights as a Representative by delegating nearly unlimited legislative power to a federal agency in the executive branch and attempting to entrench federal health care regulations from congressional review or repeal through the passage of the Act.

10.  Plaintiff Kirk Adams is the presiding officer of the Arizona House of Representatives and an elected Representative of the State of Arizona for Legislative District 19.  Plaintiff Adams objects to the federal government exceeding its constitutional powers and burdening his voting rights as a state legislator through the passage of the Act by using the threat of extreme economic duress to influence the passage or repeal of state appropriations.

11.  Plaintiff Carolyn Allen is an elected Senator of the State of Arizona for Legislative District 8.  Plaintiff Allen objects to the federal government exceeding

its constitutional powers and burdening her voting rights as a state legislator through the passage of the Act by using the threat of extreme economic duress to influence the passage or repeal of state appropriations.

12.  Plaintiff Sylvia Allen is an elected Senator of the State of Arizona for Legislative District 5.  Plaintiff Allen objects to the federal government exceeding its constitutional powers and burdening her voting rights as a state legislator through the passage of the Act by using the threat of extreme economic duress to influence the passage or repeal of state appropriations.

13.  Plaintiff Ron Gould is an elected Senator of the State of Arizona for Legislative District 3.  Plaintiff Gould objects to the federal government exceeding its constitutional powers and burdening his voting rights as a state legislator through the passage of the Act by using the threat of extreme economic duress to influence the passage or repeal of state appropriations.

14.  Plaintiff Chuck Gray is an elected Senator of the State of Arizona for Legislative District 19.  Plaintiff Gray objects to the federal government exceeding its constitutional powers and burdening his voting rights as a state legislator through the passage of the Act by using the threat of extreme economic duress to influence the passage or repeal of state appropriations.

15.  Plaintiff Linda Gray is an elected Senator of the State of Arizona for Legislative District 10.  Plaintiff Gray objects to the federal government

exceeding its constitutional powers and burdening her voting rights as a state legislator through the passage of the Act by using the threat of extreme economic duress to influence the passage or repeal of state appropriations.

16.  Plaintiff Jack Harper is an elected Senator of the State of Arizona for Legislative District 4.  Plaintiff Harper objects to the federal government exceeding its constitutional powers and burdening his voting rights as a state legislator through the passage of the Act by using the threat of extreme economic duress to influence the passage or repeal of state appropriations.

17.  Plaintiff John Nelson is an elected Senator of the State of Arizona for Legislative District 12.  Plaintiff Nelson objects to the federal government exceeding its constitutional powers and burdening his voting rights as a state legislator through the passage of the Act by using the threat of extreme economic duress to influence the passage or repeal of state appropriations.

18.  Plaintiff Cecil Ash is an elected Representative of the State of Arizona for Legislative District 18.  Plaintiff Ash objects to the federal government exceeding its constitutional powers and burdening his voting rights as a state legislator through the passage of the Act by using the threat of extreme economic duress to influence the passage or repeal of state appropriations.

19.  Plaintiff Nancy Barto is an elected Representative of the State of Arizona for Legislative District 7.  Plaintiff Barto objects to the federal

government exceeding its constitutional powers and burdening her voting rights as a state legislator through the passage of the Act by using the threat of extreme economic duress to influence the passage or repeal of state appropriations.

20.  Plaintiff Andrew Biggs is an elected Representative of the State of Arizona for Legislative District 22.  Plaintiff Biggs objects to the federal government exceeding its constitutional powers and burdening his voting rights as a state legislator through the passage of the Act by using the threat of extreme economic duress to influence the passage or repeal of state appropriations.

21.  Plaintiff Judy Burges is an elected Representative of the State of Arizona for Legislative District 4.  Plaintiff Burges objects to the federal government exceeding its constitutional powers and burdening her voting rights as a state legislator through the passage of the Act by using the threat of extreme economic duress to influence the passage or repeal of state appropriations.

22.  Plaintiff Steve Court is an elected Representative of the State of Arizona for Legislative District 18.  Plaintiff Court objects to the federal government exceeding its constitutional powers and burdening his voting rights as a state legislator through the passage of the Act by using the threat of extreme economic duress to influence the passage or repeal of state appropriations.

23.  Plaintiff David Gowan is an elected Representative of the State of Arizona for Legislative District 30.  Plaintiff Gowan objects to the federal

government exceeding its constitutional powers and burdening his voting rights as a state legislator through the passage of the Act by using the threat of extreme economic duress to influence the passage or repeal of state appropriations.

24.  Plaintiff Laurin Hendrix is an elected Representative of the State of Arizona for Legislative District 22.  Plaintiff Hendrix objects to the federal government exceeding its constitutional powers and burdening his voting rights as a state legislator through the passage of the Act by using the threat of extreme economic duress to influence the passage or repeal of state appropriations.

25.  Plaintiff Russell Jones is an elected Representative of the State of Arizona for Legislative District 24.  Plaintiff Jones objects to the federal government exceeding its constitutional powers and burdening his voting rights as a state legislator through the passage of the Act by using the threat of extreme economic duress to influence the passage or repeal of state appropriations.

26.  Plaintiff John Kavanagh is an elected Representative of the State of Arizona for Legislative District 8.  Plaintiff Kavanagh objects to the federal government exceeding its constitutional powers and burdening his voting rights as a state legislator through the passage of the Act by using the threat of extreme economic duress to influence the passage or repeal of state appropriations.

27.  Plaintiff Debbie Lesko is an elected Representative of the State of Arizona for Legislative District 9.  Plaintiff Lesko objects to the federal

government exceeding its constitutional powers and burdening her voting rights as a state legislator through the passage of the Act by using the threat of extreme economic duress to influence the passage or repeal of state appropriations.

28.  Plaintiff Lucy Mason is an elected Representative of the State of Arizona for Legislative District 1.  Plaintiff Mason objects to the federal government exceeding its constitutional powers and burdening her voting rights as a state legislator through the passage of the Act by using the threat of extreme economic duress to influence the passage or repeal of state appropriations.

29.  Plaintiff Steve Montenegro is an elected Representative of the State of Arizona for Legislative District 12.  Plaintiff Montenegro objects to the federal government exceeding its constitutional powers and burdening his voting rights as a state legislator through the passage of the Act by using the threat of extreme economic duress to influence the passage or repeal of state appropriations.

30.  Plaintiff Rick Murphy is an elected Representative of the State of Arizona for Legislative District 9.  Plaintiff Murphy objects to the federal government exceeding its constitutional powers and burdening his voting rights as a state legislator through the passage of the Act by using the threat of extreme economic duress to influence the passage or repeal of state appropriations.

31.  Plaintiff Warde V. Nichols is an elected Representative of the State of Arizona for Legislative District 21.  Plaintiff Nichols objects to the federal

government exceeding its constitutional powers and burdening his voting rights as a state legislator through the passage of the Act by using the threat of extreme economic duress to influence the passage or repeal of state appropriations.

32.  Plaintiff Carl Seel is an elected Representative of the State of Arizona for Legislative District 6.  Plaintiff Seel objects to the federal government exceeding its constitutional powers and burdening his voting rights as a state legislator through the passage of the Act by using the threat of extreme economic duress to influence the passage or repeal of state appropriations.

33.  Plaintiff David Stevens is an elected Representative of the State of Arizona for Legislative District 25.  Plaintiff Stevens objects to the federal government exceeding its constitutional powers and burdening his voting rights as a state legislator through the passage of the Act by using the threat of extreme economic duress to influence the passage or repeal of state appropriations.

34.  Plaintiff Andrew Tobin is an elected Representative of the State of Arizona for Legislative District 1.  Plaintiff Tobin objects to the federal government exceeding its constitutional powers and burdening his voting rights as a state legislator through the passage of the Act by using the threat of extreme economic duress to influence the passage or repeal of state appropriations.

35.  Plaintiff Janson T. Vogt is an elected Representative of the State of Arizona for Legislative District 30.  Plaintiff Vogt objects to the federal

government exceeding its constitutional powers and burdening his voting rights as a state legislator through the passage of the Act by using the threat of extreme economic duress to influence the passage or repeal of state appropriations.

36.  Plaintiff James Weiers is an elected Representative of the State of Arizona for Legislative District 10.  Plaintiff Weiers objects to the federal government exceeding its constitutional powers and burdening his voting rights as a state legislator through the passage of the Act by using the threat of extreme economic duress to influence the passage or repeal of state appropriations.

37.  Plaintiff Jerry Weiers is an elected Representative of the State of Arizona for Legislative District 12.  Plaintiff Weiers objects to the federal government exceeding its constitutional powers and burdening his voting rights as a state legislator through the passage of the Act by using the threat of extreme economic duress to influence the passage or repeal of state appropriations.

38.  Plaintiff Kimberly Yee is an elected Representative of the State of Arizona for Legislative District 10.  Plaintiff Yee objects to the federal government exceeding its constitutional powers and burdening her voting rights as a state legislator through the passage of the Act by using the threat of extreme economic duress to influence the passage or repeal of state appropriations.

39.  Defendant Timothy Geithner is Secretary of the United States Department of the Treasury.  As Treasury Secretary, Defendant Geithner is head

of the Internal Revenue Service ("IRS") and is responsible for enforcing the

Internal Revenue Code ("I.R.C."), including overseeing the collection of taxes and

certain penalties assessed by the Act.  Defendant Geithner is sued in his official

capacity.

40.   Defendant Kathleen Sebelius is the Secretary of the United States

Department of Health and Human Services.  As Secretary of the U.S. Department

of Health and Human Services, Defendant Sebelius is principally responsible for

administering the Act.  Defendant Sebelius is sued in her official capacity.

41.  Defendant Eric Holder, Jr. is the Attorney General of the United States.

As the Attorney General, Defendant Holder is the head of the Department of

Justice and the chief law enforcement officer of the federal government.

Accordingly, Defendant Holder is responsible for enforcing the civil and criminal

laws of the United States, including the Act.  Defendant Holder is sued in his

official capacity.

42.  Defendant Barack Obama is the President of the United States.  The

Constitution's executive power is vested in the President.  As head of the

Executive Branch, Defendant Obama is empowered to direct and enforce the laws

of the United States, including the Act.  Defendant Obama is sued in his official

capacity.

# GENERAL ALLEGATIONS

## The Act Forces Plaintiff Coons to Buy Insurance
## He Does Not Want or Need

43.  Plaintiff Coons does not maintain and has no intention of maintaining health insurance coverage for the foreseeable future and at least through 2020. Rather than maintaining health insurance, Mr. Coons has maintained a savings account since 2006, in which he sets aside savings for medical expenses and other unusual or extraordinary expenses to be paid out of pocket.

44.  Plaintiff Coons does not maintain insurance because he is healthy and has never been seriously ill.  At age 31, he believes he will not need insurance coverage for at least another ten years; thereafter, Mr. Coons only intends to purchase insurance providing catastrophic coverage with at least a $5000 deductible.

45.  Plaintiff Coons has a greater incentive to maintain his health without insurance than he would have with insurance.  Mr. Coons believes that retaining freedom of choice over whether to purchase insurance helps him maintain his health and stay healthy.

46.  Because his household income is roughly $80,000 per year, Mr. Coons also believes that his resources, for at least the next ten years, are better spent on growing his small business than on medical insurance if he is to create the wealth he needs to enjoy his life to the fullest in his later years.

47.  Plaintiff Coons is not: a) a religious conscientious objector to the Act; b) a member of a health care ministry; c) a member of an Indian Tribe; d) incarcerated; e) a veteran; or f) eligible for Medicaid or Medicare.

48.  By refusing to purchase health care coverage for the next ten years, Plaintiff Coons will be subject to penalties under the Act.

49.  Specifically, beginning in 2014, the Act will force private citizens, including Plaintiff Coons, to purchase health care coverage under penalty of federal law (the "individual mandate").  H.B. 3590 § 1501(b) (I.R.C. § 5000A (a) and (b) (2010)).

50.  The Act forces Plaintiff Coons to purchase insurance with specified "minimum essential coverage," H.B. 3590 § 1501(b) (I.R.C. § 5000A (a) and (f) (2010)), which exceeds coverage that Coons believes he may need and requires him to pay for services he may never use.

51.  Plaintiff Coons does not qualify for any exemption or waiver of the individual mandate.

52.  If a private citizen such as Plaintiff Coons chooses not to purchase an acceptable or minimum essential level of health care coverage, as determined by the federal government, monetary penalties will be imposed by Defendants under the Act (hereinafter the "individual mandate penalty").  H.B. 3590 § 1501(b) (I.R.C. § 5000A(b) (2010)).

53.   The amount of the individual mandate penalty is either the sum of "monthly penalty amounts" or a flat rate equal to the amount of "the national average premium for qualified health plans which have a bronze level of coverage," whichever is less.  H.B. 3590 § 1501(b) (I.R.C. § 5000A(c)(1) (2010)).

54.   The individual mandate's "monthly penalty amounts" are the greater of a flat dollar amount or a percentage of income.  The "monthly penalty amounts" are imposed according to the following schedule:  $95 in 2014, $325 in 2015, and $695 in 2016 for the flat fee; or up to 1.0% of taxable income in 2014, 2.0% of taxable income in 2015, and 2.5% of taxable income in 2016.  H.B. 4872 § 1002 (I.R.C. § 5000A(c)(2) (2010)).  After 2016, the penalty is subject to yearly cost of living adjustments.  H.B. 3590 § 1501(b) (I.R.C. § 5000A(c) (2) and (3) (2010)).

55.   Additionally, citizens such as Plaintiff Coons, are subject to separate penalties for failing to maintain acceptable coverage for their dependents.  H.B. 3590 § 1501(b) (I.R.C. § 5000A (b) (1) and (3) (2010)).

56.   To ensure that he will have sufficient funds to pay the individual mandate penalty, Plaintiff Coons is currently forced to consider saving a significant portion of his income to pay the anticipated individual mandate penalties he will face beginning in 2014.

**The Act Forces Plaintiff Coons to Surrender his Medical Privacy**

57.  Beginning in 2014, the threat of the individual mandate's penalties will force Plaintiff Coons to disclose private medical information to health insurance issuers; applications for individual and small group health insurance from Arizona health plans and health insurance issuers (collectively "health insurance issuers") have customarily required and will continue to require the disclosure of private and personal medical information by applicants.

58.  Additionally, health insurance issuers in Arizona customarily request that individual applicants for health insurance sign a general authorization for the disclosure of their medical information, history and records under the federal Health Insurance Portability and Accountability Act ("HIPAA") of 1996, Pub. L. No. 104-191.

59.  The request for a general HIPAA disclosure authorization is customarily made by health insurance issuers even for small group insurance plan applicants, despite the fact that prospective insureds with preexisting conditions are not ordinarily excluded from small group health insurance coverage.

60.  Arizona health insurance issuers request such general HIPAA disclosure authorizations wholly apart from any possible decision to deny health insurance coverage for preexisting conditions because they need to assess their exposure for future medical claims from new applicants for rate-setting purposes.

61.  The custom and practice of Arizona health insurance issuers requesting medical information and a general HIPAA disclosure authorization in connection with processing health insurance applications is likely to continue for the foreseeable future and certainly well beyond 2014.

62.  The general HIPAA disclosure authorization typically required of applicants for health insurance in Arizona allows health insurance issuers to disclose to third parties personal medical information, history and records of applicants for any legitimate business purpose, including marketing purposes, such as the disclosure of personal medical information and records to data-mining businesses.  *See* 45 C.F.R. §§ 164.501, 164.508(a)(2), 508(a)(3).

63.  In fact, Arizona health insurance issuers and other insurers around the country routinely share the personal medical information of millions of insureds and insurance applicants with private organizations, such as the Medical Information Bureau ("MIB"), United Health Group-Ingenix and Milliman, which maintain searchable databases of personal medical information concerning past and present insureds and insurance applicants.

64.  About 600 insurance firms use the services of the MIB to obtain information about individual health insurance policy applicants.

65.  The Medpoint and Intelliscript databases maintained by Ingenix and Milliman include personalized prescription records for at least the preceding five

years.  *See* Chad Terhune, *They Know What's in Your Medicine Cabinet*,

BUSINESSWEEK, July 23, 2008, *available at*

http://www.businessweek.com/magazine/content/08_31/b4094000643943.htm?ch

an=magazine+channel_in+depth (last visited May 5, 2010).

66.  Even without a signed HIPAA disclosure authorization or the insurance

applicant's consent, health insurance issuers are required under HIPAA to disclose

personal medical information, history and records of health insurance applicants

to the U.S. Department of Health and Human Services when it undertakes a

compliance investigation, compliance review or enforcement action.  45 C.F.R. §

164.502(a)(2).

67.  Without the insurance applicant's consent, health insurance issuers are

authorized under HIPAA to disclose personal medical information, history and

records of health insurance applicants in any of the following circumstances,

among others:

a)  For medical treatment, payment and health care operations, 45 C.F.R. §
164.501, including disclosures for patient referrals, training programs for
students and health care practitioners, collections and general administrative
activities, 45 C.F.R. § 506(c), and;

b)  For general public interest purposes, including disclosures required by
statute, regulation, administrative process or court order, disclosures
requested by public health authorities or needed for government benefit
administration, state and federal regulatory agencies, law enforcement
agencies or academic researchers, to prevent threats to public health and
safety, and to assure performance of essential governmental functions, such
as the proper execution of a military mission or to conduct intelligence or

national security activities.  45 C.F.R. §§ 164.501, 502(j)(2), 504(f), 512, 514(d), (e).

68.  In addition to the disclosures expressly required or authorized by law, HIPAA permits the incidental use or disclosure of personal medical information, history and records provided that "reasonable safeguards" are in place to prevent the occurrence from happening too often or too egregiously.  *See* 45 C.F.R. § 164.530(c)(2).

69.  "Business associates" of health insurance issuers, such as collection agencies and data-storage, data-sharing or data-mining businesses, may make any disclosure that HIPAA authorizes the insurer to make.  45 C.F.R. § 164.504(e).

70.  With or without the consent of the insurance applicant or a HIPAA disclosure authorization, *millions* of entities, including health insurance issuers, underwriters, providers, self-insured employers, regulatory agencies, law enforcement, military and intelligence agencies, universities, disease registries, insurance brokers, pharmacy benefits managers, laboratories, hospitals, and their business associates, such as credit bureaus, law firms, pharmaceutical companies, accounting firms, offshore data warehouses and transcription services, and *millions more* employees of such entities, both full time and temporary, are authorized under HIPAA and Arizona law to access personal medical information, history and records that would be furnished by individuals, including Plaintiff Coons, obtained as part of the insurance application process.

71.  HIPAA does not require audit trails for all uses and disclosures of personal medical information, history and records.  *See* 45 C.F.R. § 164.528(a)(1).

72.  HIPAA does not require data encryption for stored electronic medical information or records when the data is not being transmitted.

73.  HIPAA does not require at least two-factor authentication (password plus additional identification) for access to secure medical data systems.

74.  A 15 month study published by the eHealth Vulnerability Reporting Program in 2007 revealed that hackers could penetrate every medical data system maintained by 850 providers.

75.  Since the enactment of HIPAA, there have been numerous reported instances of confidential personal medical information, history and records being disclosed, including much publicized incidents in which UCLA hospital employees were repeatedly caught snooping in pop singer Britney Spears' files and actress Farrah Fawcett's cancer records.  Charles Ornstein, *Fawcett's cancer file breached*, LOS ANGELES TIMES, April 3, 2008.

76.  Since April 2003, the U.S. Department of Health and Human Services ("HHS") and affiliated federal agencies have received over 50,989 complaints that disclosures of medical information, history or records violated HIPAA.  Of the more than 45,000 complaints processed to date, at least 10,515 investigation and enforcement cases have been brought against health plans (group health plans and

health insurance issuers) and other entities governed by HIPAA.   The two most frequent complaints investigated by HHS are impermissible use and disclosure of protected health information and the lack of safeguards for protected health information.

77.  Arizona state law does not provide more protection for the privacy of personal medical information, history and records obtained as part of the insurance application process than does HIPAA.

78.  Arizona health insurance issuers are in full compliance with the medical information and records disclosure regulations of the Arizona Insurance Information and Privacy Protection Act when they comply with HIPAA.  Ariz. Rev. Stat. Ann. § 20-2122(A) (2010).

79.  Arizona health insurance issuers that disclose personal medical information, history and records in compliance with HIPAA are immune under state law from any liability for invasion of privacy unless they disclose or furnish false information with malice or willful intent to injure any person.  *Compare* Ariz. Rev. Stat. Ann. § 20-2119 (2010) *with* § 20-2122(A) (2010).

80.  Compelling citizens, such as Plaintiff Coons, to purchase insurance will require them as a matter of law and fact to share and/or risk sharing with *millions of strangers who are not physicians* confidential private and personal medical history information, which they do not wish to share, and to which they have a

legitimate and constitutionally protected claim of privacy in refusing to share.  *See United States v. Katz*, 389 U.S. 347 (1967); *Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting); *cf. U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person").

81.  Plaintiff Coons objects to and fears the loss of privacy threatened by the Act's individual mandate.

82.  Plaintiff Coons' concerns about the loss of privacy from the individual mandate are reasonable because HIPAA and Arizona state law do not guarantee a reasonable degree of security in the confidentiality of private and personal medical information, history and records disclosed to and authorized to be disclosed to health insurance issuers as part of the health insurance application process.

83.  Plaintiff Coons' reasonable concerns about the loss of medical privacy threatened by the individual mandate are currently chilling and will continue to chill his willingness to freely and openly communicate with health care professionals about personal medical matters and thereby prevent the openness and intimacy required by an effective doctor-patient relationship, which threatens to undermine the quality of his health care.

**The Act Burdens the Legislative Powers of
Plaintiffs Flake, Franks and Shadegg**

84.  The Act creates the Independent Payment Advisory Board ("IPAB"), which is to comprise of 15 voting members appointed by the President with the advice and consent of the Senate; the Secretary of Health and Human Services, the Administrator of the Center for Medicare & Medicaid Services, and the Administrator of the Health Resources and Services Administration, "serve ex officio as nonvoting members of the Board."  H.B. 3590 (as modified by H.B. 4872) § 3403 (42 U.S.C. § 1395kkk(g)(1)(A) (i) and (ii) (2010)).

85.  Beginning in 2014, the Act requires IPAB to make "detailed and specific proposals related to the Medicare program."  H.B. 3590 (as modified by H.B. 4872) § 3403 (42 U.S.C. § 1395kkk(c)(1)(A) (2010)).

86.  The Act also requires IPAB to make "recommendations" that "will cause a net reduction in total Medicare program spending in the implementation year that is at least equal to the applicable savings target."  H.B. 3590 (as modified by H.B. 4872) § 3403 (42 U.S.C. § 1395kkk(c)(2)(A)(i) (2010)).

87.  IPAB's regulatory proposal and recommendation powers under the Act are not merely advisory; they become law and must be implemented by the Secretary of Health and Human Services if Congress does not act to amend them by August 15th of each successive session.  H.B. 3590 (as modified by H.B. 4872) § 3403 (42 U.S.C. § 1395kkk(e)(1) (2010)).

88.  The Act anticipates and authorizes IPAB to propose and recommend regulations for private health care markets and non-federal health care delivery systems because IPAB has a statutory obligation to "coordinate" its proposals and recommendations with studies of private health care markets and non-federal health care delivery systems.  H.B. 3590 (as modified by H.B. 4872) § 3403 (42 U.S.C. § 1395kkk (c)(2)(B), (n), (o)(1) and (2) (2010)).

89.  Because IPAB is prohibited from directly rationing health care, increasing Medicare beneficiary cost sharing, restricting Medicare benefits and modifying Medicare eligibility criteria to meet its Medicare spending reduction target, *see* H.B. 3590 (as modified by H.B. 4872) § 3403 (42 U.S.C. § 1395kkk(c)(2)(A) (2010)), IPAB will inevitably propose and recommend: a) reductions in Medicare payments under parts C and D; b) reduced reimbursement rates to health care providers furnishing services to Medicare beneficiaries;  c) restructured reimbursement rates based on a "capitated model," under which a set amount unrelated to actual supply and demand for services will be paid per illness or injury; d) price controls and/or pricing mandates and similar regulations for private health care markets and non-federal health care delivery systems; and/or e) reductions in appropriations for Medicare program spending or other programs which would otherwise increase Medicare program spending.

90.  When any of IPAB's foregoing proposals or recommendations become law, or if they are anticipated by health care providers to become law, health care providers will withdraw from participating in Medicare and reduce the availability of health care services to a greater extent than would otherwise be the case.

91.  Reasonable expectations of any of IPAB's foregoing proposals or recommendations becoming law: a) discourages entry by individuals into the health care professions; b) discourages investment and innovation in health care industries; c) reduces the supply of health care providers willing to furnish health services in private health care markets and in non-federal health care delivery systems; d) increases demand for health care services by consumers in private health care markets and in non-federal health care delivery systems in the interim before such regulations become effective; and e) causes higher prices for health care services in private health care markets and in non-federal health care delivery systems in the interim before such regulations become effective.

92.  According to economist and former U.S. Department of Labor Secretary Robert Reich, it is reasonable to expect that health reforms such as those entrusted to IPAB's regulatory authority: a) "means you–particularly you young people–particularly you young healthy people–you're going to have to pay more"; b) "if you're very old–we're not going to give you all that technology and all those drugs for the last couple of years of your life to keep you maybe going for

another couple of months.  It's too expensive.  So we're going to let you die"; and

c) "drug companies and insurance companies and medical suppliers [will be

forced] to reduce their costs . . . [which] means less innovation and that means less

new products and less new drugs on the market which means you are probably not

going to live that much longer than your parents."  Audio recording: Robert

Reich's lecture to Professor Alan Ross' political science class at the University of

California, Berkeley (September 9, 2007),

http://webcast.berkeley.edu/stream.php?type=download&webcastid=20057 (last

visited August 2, 2010).

93.  The Act entrenches numerous limitations on each House's

parliamentary rules to burden and limit the ability of Representatives and Senators

to review, debate, modify or reject the IPAB's proposals and recommendations

before they automatically become law and must be implemented by the Secretary

of Health and Human Services.

94.  The Act's entrenched limitations on parliamentary rules for future

Congresses considering IPAB's proposals and recommendations include, but are

not limited to, the following:

A) Upon receipt of IPAB's legislative proposal, the majority leader of the
House and Senate must introduce the legislation and, if no introduction is
made within five days after receipt, any member of the House or Senate
may introduce the legislation, whereupon IPAB's legislative proposal must
be referred "by the Presiding Officers of the respective Houses to the
Committee on Finance in the Senate and to the Committee on Energy and

Commerce and the Committee on Ways and Means in the House of Representatives." H.B. 3590 (as modified by H.B. 4872) § 3403 (42 U.S.C. § 1395kkk(d)(1) (2010)).

B) If IPAB's legislative proposal is not acted upon on or before April 1st of the respective session, by the Committee on Finance in the Senate and to the Committee on Energy and Commerce and the Committee on Ways and Means, then the Committee's consideration of the same is required to be terminated. H.B. 3590 (as modified by H.B. 4872) § 3403 (42 U.S.C. § 1395kkk(d)(2) (2010)).

C) If any action is taken on IPAB's legislative proposal, the Act requires the House and Senate to enforce parliamentary rules precluding any modification of IPAB's proposed legislation that increases total Medicare program spending or that fails to cause "a net reduction in total Medicare program spending in the implementation year that is at least equal to the applicable savings target." H.B. 3590 (as modified by H.B. 4872) § 3403 (42 U.S.C. § 1395kkk(d)(3)(B) (2010)).

D) The Act requires the Senate to enforce parliamentary rules precluding more than 30 hours of debate on IPAB's legislative proposal, precluding more than 10 hours of debate after IPAB's legislative proposal returns from conference committee, and precluding more than 1 hour of debate after any veto by the President. H.B. 3590 (as modified by H.B. 4872) § 3403 (42 U.S.C. § 1395kkk(d)(4) (B) through (F) (2010)).

E) The Act entrenches the foregoing parliamentary rules by declaring they supersede contrary rules, expressly prohibiting their repeal, and by requiring a three-fifths vote of all of the members of the respective House to waive them. H.B. 3590 (as modified by H.B. 4872) § 3403 (42 U.S.C. § 1395kkk(d)(3 )(C), (D), (E) (2010)).

95. The Act further entrenches the delegation of legislative powers to IPAB and insulates IPAB from congressional review by prohibiting Congress from repealing IPAB's statutory enabling authority except through a specifically worded "Joint Resolution," which may be proposed only during the year of 2017,

before February 1st, and passed only upon a three-fifths vote of all members of each House.  H.B. 3590 (as modified by H.B. 4872) § 3403 (42 U.S.C. § 1395kkk(f) (2010)).

96.  In effect, in 2017 Plaintiffs Flake, Franks and Shadegg and other federal legislators only have at or about 14 business days to propose such a "Joint Resolution" repealing IPAB's statutory enabling authority or the Act forever forecloses them from doing so.

97.  The Act thus burdens and/or purports to deny members of Congress, including Plaintiffs Representatives Flake, Franks and Shadegg of their legislative power and right to consider, review, debate and vote on the legislative proposals of IPAB like any other legislative proposal and to repeal IPAB like any other administrative agency that is legislatively established.

98.  Representatives Flake, Franks and Shadegg and other federal legislators will propose legislation, as part of the normal course of their legislative rights and duties, to repeal the IPAB provisions of the Act.  Plaintiffs Flake, Franks and Shadegg are discouraged from proposing such legislation now and in the future because of the express provisions of the Act that unlawfully change rulemaking in Congress and prohibit Congress from considering any bill, resolution, amendment or conference report that would repeal IPAB, between January 1, 2017 and January 31, 2017, and only if passed upon a three-fifths vote of all members of

each House.  H.B. 3590 (as modified by H.B. 4872) § 3403 (42 U.S.C. § 1395kkk(f) (2010)).

### The Act Burdens the Quasi-Sovereign Legislative Powers
### of State Legislator Plaintiffs

99.  The Arizona Legislature has plenary authority over appropriations. The Arizona Legislature's plenary authority is not limited by enumerated constitutional objectives.

100.  The State of Arizona–unlike Congress–has inherent police powers.

101.  In 1998, the attorneys general of 46 states, including Arizona, agreed to settle a lawsuit they filed against the manufacturers of tobacco products.  As a result, the tobacco manufacturers must pay each of those states a portion of the estimated $206 billion settlement each year over the next 25 years.  Arizona voters, through ballot initiative Proposition 204, generously decided to use the tobacco settlement funds to expand eligibility for the Arizona Health Care Cost Containment System ("AHCCCS"), the State's health care system for the poor. Before Proposition 204, for a person to receive health care insurance under AHCCCS, the recipient's net income could not exceed approximately 34% of the federal poverty level.  Proposition 204 expanded eligibility to people who earn up to 100% of the federal poverty level.

102.  The amount Arizona must contribute towards sustaining Proposition 204's eligibility requirement has steadily increased each year since 2002.  As a

result, the tobacco settlement funds have proven insufficient to sustain Proposition 204's expanded eligibility.  In fiscal year 2010 alone, Proposition 204 AHCCCS eligibility costs are $635.2 million.  Of that amount, the tobacco settlement revenue contributes $108.2 million, while the State's general fund contributes $460.7 million and other state funds contribute the remaining $66.3 million needed to keep AHCCCS out of the red.

103.  Despite the fact that Arizona is already among a handful of the most generous states in funding access to government funded medical care, and is increasingly unable to afford such generosity, the Act now requires that Arizona vastly broaden its Medicaid eligibility standards from 100% of the federal poverty level to 133% and correspondingly increases Arizona's maintenance of effort requirements.

104.  The Act's individual mandate combined with its increased Medicaid eligibility and maintenance of effort requirements will inevitably cause many more individuals to enroll in Medicaid than would have otherwise enrolled, as a result of the "woodwork effect."  The Act will thereby cause the State of Arizona to face a legion of new Medicaid enrollees, for whom Arizona does not have the ability to fund related health care costs.

105.  The Act's increased Medicaid eligibility and maintenance of effort requirements in effect punish Arizona and its citizens for their initial generosity

under Proposition 204 by coercing the state into continuing to cover individuals well beyond the baseline required for federal Medicaid matching funds in other states.  This is a cost Arizona, which is experiencing a financial crisis, cannot afford.

106.   Arizona's Joint Legislative Budget Committee estimates that the Act's increased Medicaid eligibility and maintenance of effort requirements will cost Arizona between $7,466,973,000 and $11.6 billion through 2020.

107.   The Act's onerous financial burden on the State occurs at a time when Arizona must already make severe budget cuts, in excess of $2.3 billion through 2020, to offset revenue shortfalls because the Arizona Constitution (unlike its federal counterpart) requires the state budget to be balanced each fiscal year. ARIZ. CONST., art. 9, §§ 3, 5.

108.   If Arizona refuses to comply with the Act's new Medicaid eligibility and maintenance of effort requirements, Arizona will reportedly lose federal matching funds, including all Title 11 and Title 19 funding, in the amount of at least $7.65 billion each fiscal year beginning 2011, vastly deepening the revenue shortfall preventing the state budget from being balanced and necessitating wholesale lay-offs of state employees and suspension of substantially all state governmental services.

109.   The threat of losing federal matching funds for noncompliance with the Act's eligibility and maintenance of effort requirements forced a "Hobson's choice" on Arizona legislators, including State Legislator Plaintiffs.

110.   The threat of losing federal matching funds, including all Title 11 and Title 19 funding, during fiscal year 2010-11 for noncompliance with the Act's eligibility and maintenance of effort requirements has already substantially burdened the legislative deliberations of State Legislator Plaintiffs and other state legislators by preventing them from freely exercising their legislative powers and voting rights to make crucial budget cuts during the 2010 legislative session.

111.   Specifically, after the Act's enactment, Arizona legislators, including State Legislator Plaintiffs, were compelled by the threat of the loss of federal matching funds to vote for legislation complying with the Act's new Medicaid eligibility and maintenance of effort requirements.  In so doing, State Legislator Plaintiffs overrode their earlier decision to vote for legislation that would have allowed the State to comply with its constitutional balanced budget requirements by eliminating the diversion of $2 billion dollars in general fund revenues to the "KidsCare" program (an insurance program for children whose family income is too high to qualify for AHCCCS) and Proposition 204 as of fiscal year 2010-11.

112.   State Legislator Plaintiffs intend to introduce a bill in any 2010 special legislative sessions or 2011 legislative session, to cut the funding to KidsCare and

Proposition 204, in order to fund the Medicaid and maintenance of efforts requirements that PPACA requires them to fund.

113.  In addition to expanding Medicaid coverage, the Act requires states to exercise oversight over health insurance sales to ensure value for the consumer, H.B. 3590 § 1001 (42 U.S.C. § 300gg-18(b) (2010)), review and report premium increases to the Secretary of Health and Human Services, H.B. 3590 § 1001 (42 U.S.C. § 300gg-94(b) (2010)), and establish offices of health insurance consumer assistance or ombudsman programs, H.B. 3590 § 1001 (42 U.S.C. § 300gg-93(a) (2010)) (collectively the "consumer mandate").

114.  The Act also mandates that Arizona take administrative action and assume substantial administrative costs for, inter alia, hiring and training new employees, as well as requiring that new and existing employees devote a considerable portion of their time to implementing the Act (collectively the "administrative mandate").

115.  The Act also requires states to establish insurance exchanges by January 1, 2014 (hereinafter the "health exchange mandate"), declaring that an exchange shall be "a governmental agency or nonprofit entity that is established by a State," H.B. 3590 § 1001 (42 U.S.C. § 18031(d)(1) (2010)), which "facilitates the purchase of qualified health plans,"  H.B. 3590 § 1001 (42 U.S.C. § 18031(b)(1) (2010)), by individuals and small businesses.

116.  The Act dictates that exchanges must implement procedures for the certification of health plans, operate a toll-free hotline and website to provide assistance, rate each offered health plan according to federal criteria, inform individuals of their eligibility for Medicaid and enroll new members, grant individual mandate exemptions and report those exemptions to the Treasury Department, and coordinate coverage between employers and employees.  H.B. 3590 § 1001 (42 U.S.C. § 18031(d)(4) (2010)).

117.  If a state fails and refuses to establish its own health exchange, the federal government will "establish and operate" an insurance exchange, coercively threatening to wholly displace the state's sovereign police power to regulate the insurance industry within state boundaries if the state fails to acquiesce in the mandate to establish a health insurance exchange.  H.B. 3590 § 1001 (42 U.S.C. § 18041(c)(1) (2010)).

118.  The Act also directly imposes an employer mandate on the State of Arizona requiring Arizona to maintain certain minimum health benefits for its employees under the threat of various penalties that threaten annual liabilities to the State in excess of several million dollars for noncompliance (hereinafter the "employer mandate").   H.B. 3590 (as modified by H.B. 4872 § 1003) § 1513 (I.R.C. § 4980h (2010)).

119.  No Arizona government entity or infrastructure currently exists to adequately discharge all the responsibilities that will be necessary to implement the various mandates of the Act, to meet requirements related to increases in Medicaid enrollment under the Act, and to operate healthcare insurance exchanges required by the Act.

120.  The individual, consumer, administrative, employer, health exchange and Medicaid eligibility and maintenance of effort mandates of the Act (hereinafter the "Act's mandates"), substantially burden State Legislator Plaintiffs and other legislators' quasi-sovereign legislative voting power over state legislation and appropriations concerning the cost, nature and structure of Arizona state government, compelling them to vote in the manner preferred by the federal government in the controversial area of health care policy.

121.  Plaintiff Nick Coons' quasi-sovereign voting power is also burdened by the Act's mandates because they threaten to curtail the subject matter over which Coons is free to exercise his direct legislative authority under the initiative and referendum provisions of the Arizona Constitution.  *See, e.g.*, art. 4, pt. 1, § 1; art. 4, pt. 2, § 24; art. 9, § 23; art. 22, § 14.

# CAUSES OF ACTION

## Count I

### The Act Violates the Fifth and Ninth Amendments'
### Guarantee of Medical Autonomy

122.  Plaintiffs reallege, adopt and incorporate by reference paragraphs 1 through 121 above as though fully set forth herein.

123.  Arizona enacted legislation (hereinafter the "Health Care Freedom Public Policy") declaring: "The legislature finds that the patient protection and affordable care act (P.L. 111-148) violates the public policy of this state."  H.B. 2002(2) (Ariz. 2010), *available at* http://www.azleg.gov/legtext/49leg/8s/bills/hb2002h.pdf (last visited August 5, 2010).

124.   Pursuant to its Health Care Freedom Public Policy, Arizona has resolved:

A) The power to require or regulate a person's choice in the mode of securing lawful health care services, or to impose a penalty related to that choice, is not found in the constitution of the United States of America, and is therefore a power reserved to the people pursuant to the tenth amendment.  This state exercises its sovereign power to declare the public policy of this state regarding the right of all persons residing in this state in choosing the mode of securing lawful health care services.

B)  It is the public policy of this state, consistent with all constitutionally enumerated rights, as well as those rights otherwise retained by the people, that every person in this state may choose or decline to choose any mode of securing lawful health care services without penalty or threat of penalty.

C) The public policy stated in this section does not apply to impair any right of contract related to the provision of lawful health care services to any person or group.

D) The public policy stated in this section does not prohibit or limit care provided pursuant to article xviii, section 8, constitution of Arizona, or any statutes enacted by the legislature relating to workers' compensation.

E) A public official or an employee or agent of this state or any political subdivision of this state shall not act to impose, collect, enforce or effectuate any penalty in this state that violates the public policy prescribed in this section.

ARIZ. REV. STAT. ANN. § 36-1301 (2010).

125.   Additionally, during the upcoming November 2010 election cycle, Arizonans will vote on a state constitutional amendment called the Arizona Health Care Freedom Act.

126.   The Arizona Health Care Freedom Act states:

To preserve the freedom of Arizonans to provide for their health care a law or rule shall not compel, directly or indirectly, any person, employer or health care provider to participate in any health care system.  A person or employer may pay directly for lawful health care services and shall not be required to pay penalties or fines for paying directly for lawful health care services, a health care provider may accept direct payment for lawful health care services and shall not be required to pay penalties or fines for accepting direct payment from a person or employer for lawful health care services.  Subject to reasonable and necessary rules that do not substantially limit a person's options, the purchase or sale of health insurance in private health care systems shall not be prohibited by law or rule.

H.C.R. 2014(1) (Ariz. 2009), *available at* http://www.azleg.gov/legtext/49leg/1r/bills/hcr2014h.pdf (last visited August 5, 2010).

127.  Plaintiff Coons has the right to control his body, to create or refrain from creating a doctor-patient relationship, to accept or refuse medical treatment, and to make health care choices with the assistance of health care professionals (hereinafter the "right to medical autonomy").

128.  Plaintiff Coons' right to medical autonomy is a fundamental right that is rooted in Arizona state law as well as the legally privileged status, privacy and intimacy of the doctor-patient relationship under the Anglo-American conception of ordered liberty, and the constitutional rights to life and liberty, which imply the right to be left alone by the government to make personal health care decisions.

129.  Plaintiff Coons' right to medical autonomy is protected by the liberty guarantees of the Fifth and Ninth Amendments.  *See Massachusetts v. Upton*, 466 U.S. 727, 737 (1984) (Stephens, J., concurring) (observing Ninth Amendment protects rights created by state law); *Acme, Inc. v. Besson*, 10 F. Supp. 1, 6 (D. N.J. 1935) (indicating the "local, intimate, and close relationships of persons and property which arise in the processes of manufacture" are protected by the Ninth and Tenth Amendments); *Magill v. Brown*, 16 F. Cas. 408, 428 (E.D. Pa. 1833) (observing "personal rights are protected by . . . the 9th amendment").

130.  The individual mandate unduly burdens and places a substantial obstacle in the path of Plaintiff Coons' exercising his right to medical autonomy by forcing him to apply limited financial resources to obtaining a health care plan

he does not desire or otherwise to save his income to pay a penalty, both of which

mandates necessarily reduce the health care treatments and doctor-patient

relationships he can afford to choose.

131.  The individual mandate unduly burdens and places a substantial

obstacle in the path of Plaintiff Coons' exercising his right to medical autonomy

by forcing him to create or risk creating an intimate relationship concerning his

health and medical care with millions of non-physician intermediaries employed

by health insurers, rather than directly with the physician of his choice.

Depending on the insurance plans available to him, Plaintiff Coons' choice of

physicians and/or medical services may be curtailed.

132.  Additionally, the Act unduly burdens and places a substantial obstacle

in the path of Plaintiff Coons' exercising his right to medical autonomy by

imposing the threat of health care price controls and/or similar regulation that will

limit his access to medical treatment, hospitals, drugs, and physicians.

133.  Taken together, the Act's individual mandate, and related regulatory

authority, including the establishment of IPAB, cause irreparable injury by

violating Plaintiff Coons' right to medical autonomy under the Fifth and Ninth

Amendments to the U.S. Constitution.

## **Count II**

### **The Act Violates the Fourth, Fifth and Ninth Amendment's Guarantee of Privacy**

134.   Plaintiffs reallege, adopt and incorporate by reference paragraphs 1 through 133 above as though fully set forth herein.

135.  Pursuant to the Fourth Amendment, without a search warrant or equivalent legal process subject to judicial review, the federal government cannot obtain directly from citizens the personal information and medical records the individual mandate forces citizens such as Plaintiff Coons to disclose or authorize to be disclosed to health plans and health insurance issuers.

136.  Nevertheless, the federal government is legally authorized by HIPAA to access the personal information and medical records the individual mandate forces citizens such as Plaintiff Coons to disclose or authorize to be disclosed to health plans and health insurance issuers without genuine consent, a search warrant or equivalent legal process subject to judicial review.

137.  The individual mandate circumvents and violates the Fourth Amendment's guarantee of security against unreasonable searches and seizures by forcing citizens, such as Plaintiff Coons, to consent under the threat of a penalty, to authorize access to personal medical records and information to health insurance issuers, to which the government would also have access.  Without genuine consent, a search warrant or equivalent legal process subject to judicial

review, the federal government would not otherwise have access to citizens' personal medical information.

138.  In essence, the individual mandate transforms the insurance application process into a conduit by which the federal government can obtain personal medical records of citizens such as Plaintiff Coons without genuine consent, a search warrant or equivalent legal process subject to judicial review.

139.  By depriving and/or threatening to deprive Plaintiff Coons of the ability to control access to his medical information, history and records, the individual mandate, and related penalty, causes irreparable injury by violating Plaintiff Nick Coons' liberty and privacy rights under the Fourth, Fifth, and Ninth Amendments because the mandate requires a highly intrusive search and seizure that burdens his liberty interest in maintaining confidentiality in his medical information and records, without being reasonably related, much less substantially, closely or narrowly tailored, to advancing any substantial, important or compelling governmental interest.

## **Count III**

### **The Act Violates the First Amendment by Burdening State Legislator-Plaintiffs' Legislative Voting Powers**

140.  Plaintiffs reallege, adopt and incorporate by reference paragraphs 1 through 139 above as though fully set forth herein.

141.  The First Amendment requires that legislators be given "the widest latitude to express their views on issues of policy."  *Bond v. Floyd*, 385 U.S. 116, 136 (1966).

142.  The "the act of voting on public issues by a member of a public agency or board comes within the freedom of speech guarantee of the first amendment" and "there can be no more definite expression of opinion than by voting on a controversial public issue."  *Clarke v. United States*, 886 F.2d 404, 405 (D.C. Cir. 1989) (quoting *Miller v. Town of Hull*, 878 F.2d 523, 532 (1st Cir. 1989)), *vacated as moot*, 915 F.2d 699 (D.C. Cir. 1990).

143.  State Legislator Plaintiffs and other state legislators have a First Amendment right and a state constitutional duty to exercise their legislative voting powers with the widest latitude to express their views on issues of health care policy and are entitled to "broad protections" under the First Amendment from federal government interference and influence when they exercise their voting powers accordingly.  *Clarke*, 886 F.2d at 410.

144.  By imposing the Act's new Medicaid eligibility and maintenance requirements on Arizona as a condition of receiving billions of dollars of federal Medicaid funding, and by imposing additional consumer, administrative, employer and health exchange mandates, the Act exerts virtually irresistible

pressure on State Legislator Plaintiffs and other state legislators to vote, and to vote in a particular way on controversial issues of health care policy.

145.  The Act thereby substantially burdens speech protected by the First Amendment, and burdens substantially more speech than is essential to the furtherance of the federal government's asserted interests in imposing those conditions, causing State Legislator Plaintiffs and other state legislators irreparable harm by violating their First Amendment rights.

146.  Moreover, because the federal government may not withhold discretionary benefits in order to pressure citizens to waive inalienable constitutional rights, the Act's new Medicaid eligibility and maintenance requirements constitute unconstitutional conditions imposed on the receipt of federal funds, which have caused State Legislator Plaintiffs irreparable harm by violating their First Amendment rights.  *See, e.g.*, *Goldberg v. Kelly*, 397 U.S. 254, 262-63 (1970) (welfare benefits cannot be conditioned on waiver of procedural due process rights); *Sherbert v. Verner*, 374 U.S. 398, 403-06 (1963) (free exercise clause bars conditioning of unemployment benefits on agreement to work on Sabbath); *Speiser v. Randall*, 357 U.S. 513, 518-19 (1958) (First Amendment bars conditioning of tax exemption on showing that taxpayer had not engaged in subversive advocacy).

## Count IV

**By Entrenching IPAB, the Act Exceeds Congressional Powers and Violates the First Amendment by Burdening the Legislative Voting Powers of Plaintiffs Flake, Franks and Shadegg**

147.  Plaintiffs reallege, adopt and incorporate by reference paragraphs 1 through 146 above as though fully set forth herein.

148.  The legislative power of Congress does not include the power to entrench legislation from being altered by future Congresses because Congress, by statute, cannot alter the constitutional procedure required for the passage of laws. U.S. CONST. art. I, §§ 1, 7; *Reichelderfer v. Quinn*, 287 U.S. 315, 318 (1932) (stating that "the will of a particular Congress . . . does not impose itself upon those to follow in succeeding years").

149.  Correspondingly, the parliamentary rulemaking power of each House does not include the power to entrench, by statute, parliamentary rules from alteration by the Houses of future Congresses.  *See*  U.S. CONST., art. I, § 5.

150.  Congress has no power to entrench legislation and parliamentary rules, by statute, protecting IPAB's proposals, recommendations and enabling statutes from future modification, amendment or repeal by future congresses.  *See id.*

151.  Furthermore, to the very extent the Act entrenches IPAB's proposals, recommendations and enabling statutes from future modification, amendment or

repeal by future congresses, the Act substantially burdens the voting powers of Plaintiffs U.S. Representatives Flake, Franks and Shadegg and other federal legislators.

152.   The Act's entrenchment of IPAB's proposals, recommendations and enabling statutes from future modification, amendment or repeal by future congresses, burdens substantially more speech than is essential to the furtherance of the federal government's asserted interests in imposing those restrictions.

153.   The Act's entrenchment of IPAB's proposals, recommendations and enabling statutes from future modification, amendment or repeal by future congresses, causes irreparable injury by violating the First Amendment voting rights of Plaintiffs U.S. Representatives Flake, Franks, Shadegg and other federal legislators.

## **Count V**

### **The Act Exceeds the Federal Government's Commerce Clause Power**

154.   Plaintiffs reallege, adopt and incorporate by reference paragraphs 1 through 153 above as though fully set forth herein.

155.   The individual mandate is an essential element of the Act without which it would not have been passed by Congress.

156.   The Act contains no severability provision for any of its provisions.

157.  Under the Act, otherwise uninsured persons, including Plaintiff Coons, are forced to purchase private health care coverage not because they are even tangentially engaged in the production, distribution, or consumption of goods, services or commodities or any other commercial activity, but simply because they exist.

158.  The individual mandate compels uninsured persons to enroll in state Medicaid programs if they cannot afford private health care coverage.

159.  Imposing the individual mandate upon United States residents, including Plaintiff Coons, who choose not to contract for health care coverage as set forth in the Act is not regulating economic activity.

160.  Because Congress's authority is not absolute, the power to enact the Act must be found in one of Congress's enumerated powers in order to be constitutionally valid.

161.  Congress authored, passed, and supports the Act based on an extraordinarily broad interpretation of the Commerce Clause.  *See* H.B. 3590 § 1501(a) (1)-(2).

162.  Adopting Congress' interpretation of the Commerce Clause, as is implicit in the statute, would fundamentally transform our society by eliminating the vertical separation of power guaranteed by federalism, as well as the related individual liberty guarantees found in the Constitution.

163.  Before the Act's passage, the United States Senate evinced doubt that it had the power to adopt the individual mandate under the Commerce Clause. Because of those concerns, the Senate Finance Committee asked the Congressional Research Service ("CRS") to opine on the constitutionality of the individual mandate.  The CRS concluded that "[w]hether such a requirement would be constitutional under the Commerce Clause is perhaps the most challenging question posed by such a proposal, as it is a novel issue whether Congress may use this Clause to require an individual to purchase a good or service."  Jennifer Staman & Cynthia Brougher, *Requiring Individuals to Obtain Health Insurance: A Constitutional Analysis* 3 (Cong. Research Serv. July 24, 2009), *available at* http://assets.opencrs.com/rpts/R40725_20090724.pdf (last visited August 5, 2010).

164.  As early as 1994, the Congressional Budget Office acknowledged that a "mandate requiring all individuals to purchase health insurance would be an unprecedented form of federal action.  The government has never required people to buy a good or service as a condition of lawful residence in the United States." Cong. Budget Office, *The Budgetary Treatment of an Individual Mandate to Buy Health Insurance* (August 1994), *available at* http://www.cbo.gov/ftpdocs/48xx/doc4816/doc38.pdf (last visited August 5, 2010).

165.  Some members of Congress attempted to justify the Act's individual mandate by analogizing it to policies requiring drivers to maintain automobile insurance.  This analogy is flawed.  The principal purpose of automobile insurance is to provide financial protection for others in the event that the driver causes them injury.  Moreover, automobile insurance is a conditional exchange for having a state issue the privilege of a driver's license.  A driver, however, is not mandated to have a driver's license or automobile insurance unless the driver wishes to drive an automobile on public roads.  More importantly, driver's license and automobile insurance laws are state, rather than federal requirements, because the federal government does not have a general police power.

166.  An individual mandate that requires a citizen to enter into a contract with, or buy a particular product from a private party, or to participate in a government health care program, with penalties to enforce the mandate, is unprecedented in scope and in kind.  Even in wartime, when the production of material is crucial to national security, Congress has never claimed a power under the Commerce Clause to force production where there is none.  For example, during World War II, the federal government did not compel farmers to grow food for troops or workers to build tanks.  While the federal government encouraged individuals to buy war bonds to finance the Nation's war efforts, it never required them to do so under penalty of law.  Clearly, what Congress cannot do even at a

time when our Nation's survival is threatened, it cannot do in peacetime simply to avoid the severe political costs of raising taxes to pay for wildly unpopular government programs.

167.  The immense power now claimed by the federal government and Defendants does not comport with either the text or purpose of the Commerce Clause.  The Constitution gives Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with Indian Tribes."  U.S. CONST. art. I, § 8, cl. 3.  The Commerce Clause does not give Congress the power to regulate *all* commerce and *everything* having any effect thereon.

168.  Congress may not, under the guise of regulating commerce, expand its powers beyond limit.  As Justice Kennedy observes in *United States v. Lopez*, 514 U.S. 549, 577 (1995), "Were the federal government to take over the regulation of entire areas of traditional state concern, areas having nothing to do with the regulation of commercial activities, the boundaries between the spheres of federal and state authority would blur and political responsibility would become illusory."  Every activity affects commerce in some tangential or insignificant way.  Had the founders intended that the commerce power be unlimited, enumerating three categories of commerce for Congress to regulate would have been unnecessary.

169.  Indeed, the enumerated powers are all superfluous and without real effect if the commerce power extends to any matter that has any effect on

commerce.  Such an interpretation violates the traditional rule that the Constitution should not be interpreted to render other portions of the document meaningless.

170.   For Congress to regulate activity under the Commerce Clause, the activity itself must be commercial because "the power to regulate 'commerce' can by no means encompass authority over mere gun possession any more than it empowers the federal government to regulate marriage, littering, or cruelty to animals, throughout the 50 states.  Our Constitution quite properly leaves such matters to the individual States, notwithstanding these activities' effects on interstate commerce."  *Lopez*, 514 U.S. at 585 (Thomas, J., concurring).

171.   Recently, in *United States v. Morrison*, 529 U.S. 598 (2000) and *Lopez*, the Court struck down attempts to regulate non-commercial activities based upon their predicated effects on interstate commerce because those attempts went beyond the outer limits of the Commerce Clause.  *Gonzales v. Raich*, 545 U.S. 1, 25 (2005) (reaffirming the principles set forth in *Morrison* and *Lopez*).

172.  The Supreme Court recognizes that "the mere fact that Congress has said when a particular activity shall be deemed to affect commerce does not preclude further examination by this Court."  *Katzenbach v. McClung*, 379 U.S. 294, 303 (1964); *see Hodel v. Virginia Surface Mining & Reclamation Ass'n.*, 452 U.S. 264, 311 (1981) (Rehnquist, J., concurring).

173.  The status of being a citizen of Arizona is not equivalent to being in a channel of interstate commerce, nor a person or thing in instate commerce, nor is it an activity arising out of or connected with a commercial transaction.  Indeed, the status arises from an absence of commerce, not from some sort of economic endeavor, and is not even a non-economic activity affecting interstate commerce. It is entirely passive.

174.  While the Supreme Court has not adopted a categorical rule against aggregating the effects of any non-economic activity thus far in our history, the Court has never held that the Commerce Clause, even when aided by the Necessary and Proper Clause, can be used to require citizens to buy goods or services.  To depart from our history and permit the federal government to require individuals to purchase goods or services deprives the Commerce Clause of any effective limit contrary to *Lopez* and *Morrision*.  It would mutate Congress's enumerated powers into a general police power in total derogation of the Nation's constitutional scheme.

175.  Congress lacks authority to impose the individual mandate under the Commerce Clause.  *See* U.S. CONST. art. I, § 8.

176.  The individual mandate currently burdens and will continue to burden Plaintiff Coons' liberty and privacy interests, as well as his quasi-sovereign

interest in freely exercising his legislative power of initiative and referendum by denying and/or diminishing their otherwise lawful scope and effectiveness.

177.  The individual mandate injures Plaintiff Coons with current and/or threatened economic harm, the inevitability of which is patent.  *See, e.g., Okpalobi v. Foster*, 190 F.3d 337, 350 (5th Cir. 1999).

178.  By increasing and threatening to increase the financial burden of the Act's increased Medicaid eligibility and maintenance of effort requirements, the individual mandate currently burdens and will continue to burden State Legislator Plaintiffs and other state legislators' liberty and quasi-sovereign interests in legislative voting, as well as their state constitutional voting duties by contributing to the diminishment of their otherwise lawful scope and effectiveness.

179.  By increasing demand for medical services and thereby increasing the likelihood of IPAB issuing additional entrenched recommendations and proposals, the individual mandate currently burdens and will continue to burden Plaintiffs Franks, Flake and Shadegg and other legislators' liberty and quasi-sovereign interests in legislative voting, as well as their constitutional voting duties by contributing to the diminishment of their otherwise lawful scope and effectiveness.

180.  The concrete current and future burdens of the individual mandate are currently causing actual and well-founded worry, fear and anguish to Plaintiffs.

## **Count VI**

### **The Act Exceeds the Federal Government's Taxing Power**

181.  Plaintiffs reallege, adopt and incorporate by reference paragraphs 1 through 180 above as though fully set forth herein.

182.  Apart from a tax on income, the federal government has no power under the Constitution to levy a direct (capitation) tax unless it is apportioned among the states.  *See* U.S. CONST., art. I, §§ 3 and 7, cl. 4.

183.  Apportionment under the Constitution requires: (1) Congress to declare a revenue target for the tax; (2) the required revenue to be divided among the states in proportion to their census populations; and (3) each state to divide its required revenue by its tax base to produce an individual tax rate.

184.  Apart from income taxes, apportioned direct taxes, imposts and duties, the federal government may only levy excise taxes.  An excise tax is imposed on the performance of an act, the engaging in an occupation or the enjoyment of a privilege.

185.  The individual mandate penalty is neither an apportioned direct tax, nor an income tax, nor an excise tax, nor an impost or duty.

186.  If it were a tax, the individual mandate penalty could only be classified as an unapportioned direct tax, for which the federal government would lack the taxing power to levy.

187.  If it were a tax, the penalty imposed by the Act to enforce the individual mandate would violate the U.S. Constitution.

188.  If it were a tax, the federal government cannot under any circumstances prevail in collecting the individual mandate penalty.

189.  Congress lacks authority under its taxing powers, as delegated by Article I, and by implication, the Sixteenth Amendment to the Constitution, to impose the individual mandate penalty.

190.  The individual mandate penalty currently burdens and will continue to burden Plaintiff Coons' liberty and privacy interests, as well as his quasi-sovereign interest in freely exercising his legislative power of initiative and referendum by denying and/or diminishing their otherwise lawful scope and effectiveness.

191.  The individual mandate penalty injures Plaintiff Coons with current and/or threatened economic harm, the inevitability of which is patent.  *See, e.g., Okpalobi*, 190 F.3d at 350.

192.  By increasing and threatening to increase the financial burden of the Act's increased Medicaid eligibility and maintenance of effort requirements, the individual mandate penalty currently burdens and will continue to burden State Legislator Plaintiffs and other state legislators' liberty and quasi-sovereign interests in legislative voting, as well as their state constitutional voting duties by

contributing to the diminishment of their otherwise lawful scope and effectiveness.

193.  By increasing demand for medical services and thereby increasing the likelihood of IPAB issuing additional entrenched recommendations and proposals, the individual mandate penalty currently burdens and will continue to burden Plaintiffs Flake, Franks and Shadegg and other legislators' liberty and quasi-sovereign interests in legislative voting, as well as their constitutional voting duties by contributing to the diminishment of their otherwise lawful scope and effectiveness.

194.  The concrete current and future burdens of the individual mandate are currently causing actual and well-founded worry, fear, and anguish to Plaintiffs.

## Count VII

### The Act Exceeds the Federal Government's Spending Power

195.   Plaintiffs reallege, adopt and incorporate by reference paragraphs 1 through 194 above as though fully set forth herein.

196.   Arizona's decision to participate in the Medicaid program was made in the context of program requirements for coverage of specific populations and options for state flexibility.

197.  Arizona agreed to participate in Medicaid in reasonable reliance upon the reasonable understanding and expectation that its participation would be

knowing and voluntary, as a matter of both law and fact, and that there would be no duress or unconscionable conditions imposed by the federal government on the State that could prevent it from freely opting out of Medicaid to set up its own state health and welfare plans, or to provide no such benefits at all.

198.  Arizona agreed to participate in Medicaid in reasonable reliance upon the understanding and expectation that it would have considerable discretion to implement and operate its respective optional Medicaid programs in accordance with state-specific designs regarding eligibility, enrollment, and administration, so long as the programs met broad federal requirements, which did not seek to micromanage the details of program operation, override the State's reasonable discretion to conform the program to local conditions, or commandeer the State's operational discretion.

199.  Arizona did not agree to become Medicaid partners of the federal government with the understanding or expectation that the terms of its participation would be altered significantly by the federal government so as to make it financially infeasible and impracticable for Arizona to remain in or to withdraw from the Medicaid program.

200.  Arizona did not agree to become Medicaid partners of the federal government with the understanding or expectation that the federal government

would increase significantly its control and reduce significantly Arizona's discretion with respect to the Medicaid program.

201.  Arizona did not agree to become Medicaid partners of the federal government with the understanding or expectation that, after the Medicaid program become entrenched in Arizona, the federal government would alter the program's requirements to expand eligibility for enrollment beyond the State's ability to fund its participation.

202.  Arizona did not agree to become Medicaid partners of the federal government with an expectation that the federal government would exploit its control over Medicaid terms and eligibility as part of a coercive scheme to force all citizens and residents of the United States to acquire health insurance.

203.  Over the decades of Medicaid's existence in Arizona, innumerable residents of Arizona have become dependent upon Medicaid and such dependency is so pronounced that the State cannot responsibly opt out of Medicaid without a reasonable transition period.

204.  Despite dramatically and unforeseeably increasing the cost of maintaining participation in Medicaid in the midst of a financial crisis, the Act does not allow for the State to gradually opt out of the system.

205.  Instead, the Act forces Arizona to choose between accepting conditions on the receipt of federal money that on the one hand involve

surrendering Arizona's budget priorities, and its exclusive police, taxing and spending powers to the federal government, and on the other hand abandoning its constitutional debt limit and vulnerable residents who have been induced into desperate reliance upon the Medicaid system for their health care needs.

206.  The Act forces an unconscionable "Hobson's choice" upon Arizona by the federal government's leveraging circumstances of extreme economic duress to convert what was a voluntary federal-state partnership into an adhesive top-down federal program, in derogation of the principle of federalism upon which the United States was founded.

207.  State officials could not have been reasonably expected to know that opting into the Medicaid program from its inception could have such consequences or place them in such a grossly unequal and dependent bargaining position relative to the federal government.  In particular, state officials did not foresee and could not have foreseen how the Act's new Medicaid eligibility and maintenance of effort requirements would leverage the coverage requirements of Proposition 204 to impose a burden on Arizona in funding the Medicaid program that is far in excess of nearly any other state.

208.  Furthermore, the Act is so wide-ranging, lengthy and complex, and delegates so much power to currently nonexistent officials and agencies, that the

conditions imposed by the Act on the receipt of related federal funding cannot

possibly be regarded as "unambiguous."

209.  Especially in light of the unintended consequences of possible future

ballot initiative measures, it is impossible for state officials to fully understand

and appreciate the consequences of acquiescing in the latest conditions imposed

on the receipt of federal funding under the Act in connection with the new

Medicaid eligibility or maintenance of effort requirements or any other mandate

existing or yet to be discovered among the Act's hundreds of pages.

210.  In the absence of a full and knowing appreciation of the consequences

of opting into the Medicaid program and acquiescing in the latest conditions

imposed on the receipt of federal Medicaid funding under the Act, and against the

backdrop of the state's fiscal crisis, the federal government is essentially inducing

Arizona and other states to blindly surrender their sovereignty in exchange for

federal funds.

211.  Congress lacks authority under its spending powers, as delegated by

Article I of the Constitution, to induce Arizona to accept federal funding on such

conditions.

212.  The Act's new Medicaid eligibility or maintenance of effort

requirements currently burden and will continue to burden Plaintiff Coons' quasi-

sovereign interest in freely exercising his legislative power of initiative and

referendum by denying and/or diminishing their otherwise lawful scope and effectiveness.

213.  The Act's new Medicaid eligibility or maintenance of effort requirements currently burden and will continue to burden State Legislator Plaintiffs and other state legislators' liberty and quasi-sovereign interests in legislative voting, as well as their state constitutional voting duties by contributing to the diminishment of their otherwise lawful scope and effectiveness.

214.  By increasing demand for medical services and thereby increasing the likelihood of IPAB issuing additional entrenched recommendations and proposals, the Act's new Medicaid eligibility or maintenance of effort requirements currently burden and will continue to burden Plaintiffs Flake, Franks and Shadegg and other federal legislators' liberty and quasi-sovereign interests in legislative voting, as well as their constitutional voting duties by contributing to the diminishment of their otherwise lawful scope and effectiveness.

215.  The concrete current and future burdens of the Act's new Medicaid eligibility or maintenance of effort requirements are currently causing actual and well-founded worry, fear and anguish to Plaintiffs.

## Count VIII

**The Act's Establishment of IPAB Violates Separation of Powers Doctrine**

216.  Plaintiffs reallege, adopt and incorporate by reference paragraphs 1 through 215 above as though fully set forth herein.

217.  The legislative power of Congress does not include the power to delegate legislative authority to an executive agency without an intelligible principle to constrain the exercise of such authority.  *A. L. A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935).

218.  IPAB is an executive agency with its members appointed by the President, which also has legislative powers, over which there is no meaningful Congressional review or any judicial review of its actions.

219.  Even where the legislative power of Congress is delegated to an executive agency with an intelligible principle to guide its exercise, judicial review must be preserved to ensure the agency stays within the bounds set by Congress.  *INS v. Chadha*, 462 U.S. 919, 953 n.16 (1983); *Yakus v. United States*, 321 U.S. 414, 425 (1944); *Lathrop, Shea & Henwood Co. v. Interior Constr. & Improv. Co.*, 215 U.S. 246, 262 (1909).

220.  By carving out a discrete list of limitations on IPAB's delegated powers, the Act implicitly gives IPAB otherwise unlimited power to exercise any enumerated congressional power with respect to any governmental body, industry,

property, product, person, service or activity through its proposals and

recommendations, provided that such exercise "relates" in an undefined way to

the Medicare program.   H.B. 3590 (as modified by H.B. 4872) § 3403 (42 U.S.C.

§ 1395kkk(c) (1)(A) and (2)(C) (2010)).

221.  Aside from the Act's discrete list of limitations on IPAB's delegated

powers, nothing in the Act otherwise prevents IPAB from proposing and

recommending any kind or magnitude of regulation or taxation of any industry,

property, product, person, service or activity, which is within the power of

Congress to enact, provided such regulation or taxation "relates" to the "Medicare

program."

222.  Nothing in the Act precludes IPAB from proposing and

recommending the appropriation of federal funds and the imposition of conditions

on the receipt of such funds by any government, industry, property, product,

person, service or activity, including, but not limited to, conditions requiring

states, such as Arizona, to implement federal laws or enact new state laws

enforcing price controls or pricing mandates in order to receive federal funding.

223.  The Act provides almost no limit on and no intelligible standard

constraining the exercise of legislative power by IPAB.

224.  The Act not only delegates vast legislative powers to IPAB, it

purports to entrench the delegation of such powers against review by future

Congresses, and further explicitly prohibits administrative and judicial review of the implementation of IPAB's proposals and recommendations.  H.B. 3590 (as modified by H.B. 4872) § 3403 (42 U.S.C. § 1395kkk(e)(5) (2010)).

225.  The Act's effort to delegate and entrench IPAB's exercise of legislative power from congressional and judicial review is beyond the legislative power of Congress to enact under the United States Constitution.

226.  The Act's delegation of vast legislative powers to IPAB without intelligible standards, with attenuated congressional review and without judicial review violates the doctrine of separation of powers.

227.  Congress lacks the constitutional power to establish IPAB under the doctrine of separation of powers.

228.  The establishment of IPAB currently burdens and will continue to burden Plaintiff Flake, Franks and Shadegg and other federal legislators' liberty and quasi-sovereign interests in legislative voting, as well as their constitutional voting duties by contributing to the diminishment of their otherwise lawful scope and effectiveness.

229.  The concrete current and future burdens of the establishment of IPAB are presently causing actual and well-founded worry, fear and anguish to Plaintiffs.

## Count IX

### The Act Exceeds the Implied Power Granted
### By the Necessary and Proper Clause

230.  Plaintiffs reallege, adopt and incorporate by reference paragraphs 1 through 229 above as though fully set forth herein.

231.  The Necessary and Proper Clause confers implied supplemental power upon the federal government only when the means adopted to exercise an expressly enumerated power are: a) "appropriate"; b) "'plainly adapted' to that end"; and c) "consistent with the letter and spirit of the [C]onstitution." *Gonzales*, 545 U.S. at 39 (Scalia, J., concurring) (citing *McCulloch v. Maryland*, 4 U.S. 316, 421 (1819)).

232.  It is axiomatic that the federal government has limited and enumerated powers, which are divided and horizontally separated into distinct executive, legislative and judicial branches of government. *McCulloch*, 4 U.S. at 405 ("The government is acknowledged by all to be one of enumerated powers."); THE FEDERALIST NO. 14 (James Madison) ("[I]t is to be remembered that the general government is not to be charged with the whole power of making and administering laws.  Its jurisdiction is limited to certain enumerated objects, which concern all the members of the republic, but which are not to be attained by the separate provisions of any.  The subordinate governments, which can extend their

care to all those other subjects which can be separately provided for, will retain their due authority and activity.").

233.  Additionally, "our Constitution establishes a system of dual sovereignty between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991).  Indeed, the Constitution's great innovation is that "citizens . . . have two political capacities, one state and one federal, each protected from incursion by the other." *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 838 (Kennedy, J., concurring).  It is a "legal system unprecedented in form and design, establishing two orders of government, each with its own direct relationship, its own privity, its own set of mutual rights and obligations to the people who sustain it and are governed by it." *Id.*

234.  The letter and spirit of the constitution thus guarantees the preservation of state sovereignty by requiring the maintenance of a "compound republic" that vertically separates powers between the states and the federal government.  *See* U.S. CONST. art. I, § 8 (enumerating congressional powers); *id.* at art. I, § 10 (limiting powers of the states); *id.* at art. IV, § 4 (guaranteeing the States a Republican Form of Government); *id.* at art. V (incorporating States and Congress into the amendment process); *id.* at art. VI (making federal law supreme); *id.* at amend. X (reserving to the States powers not delegated); *id.* at amend. XI (making the States immune to suit in federal court); *Printz v. United*

*States*, 521 U.S. 898, 921-23 (1997); *New York v. United States*, 505 U.S. 144, 187-88 (1992).

235. The Constitution's guarantee of a vertical separation of powers is not an end-in-itself. *New York*, 505 U.S. at 181. The Founders intended for federalism to prevent the abuse of power by diffusing concentrations of power. *Id.* at 187-88 (observing that the Constitution "divides power among sovereigns and among branches of government precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day").

236. The most fundamental purpose of our federalist structure is to protect individual liberty, and especially those liberties guaranteed by the Bill of Rights. *New York*, 505 U.S. at 181-82 (citing THE FEDERALIST NO. 51 (James Madison); *Coleman v. Thompson*, 501 U.S. 722, 759 (1991) (Blackmun, J., dissenting); *Gregory*, 501 U.S. at 458). For federalism to protect individual liberty, there must be a healthy balance of power between the States and the federal government. *Gregory*, 501 U.S. at 458.

237. It unconstitutionally violates the "very principle of separate state sovereignty" for Congress "to compromise the structural framework of dual sovereignty . . . ." *Printz*, 521 U.S. at 932. It is equally a violation of that

principle for Congress to prohibit state sovereignty from serving its basic structural purpose of protecting individual liberty.

238.  The letter and spirit of the Constitution thus require our system of federalism to protect individual liberty and to prohibit any effort to consolidate power in the federal government in such a way that the States are prevented from serving this basic structural purpose of protecting individual liberty.

239.  The individual, consumer, administrative, employer, health exchange and Medicaid eligibility and maintenance of effort mandates of the Act, as well as any related penalties and regulatory authority, including the establishment of IPAB (hereinafter the "foregoing provisions of the Act"), are not consistent with the letter and spirit of the Constitution because they consolidate power in the federal government in such a way that the separation of powers is ignored, constitutional rights are burdened and the states are prevented from serving the basic structural purpose of protecting individual liberty.

240.  The Act's provisions creating IPAB are not consistent with the letter and spirit of the Constitution because they bypass the constitutionally prescribed manner in which proposed legislation becomes a law, related checks and balances between the executive and legislative branches, and the separation of powers between those branches, by empowering IPAB to propose and recommend legislation that can become law without Congressional action or meaningful

Congressional oversight and without being subject to a presidential veto.  *See* U.S.

CONST. art. 1, §8.

241.  The Act's effort to alter *by statute* the parliamentary rules of each

House with respect to proposed amendments to IPAB's proposals and

recommendations is not consistent with the letter and spirit of the Constitution

because it submitted each House's exclusive rulemaking authority under Article 1,

Section 5, Clause 2 of the U.S. Constitution to a majority vote *of the other House*

and a *Presidential veto*.

242.  The foregoing provisions of the Act are not appropriately or plainly

adapted to exercising any enumerated power of the federal government.

243.  Congress lacks the power under the Necessary and Proper Clause to

impose the foregoing provisions of the Act.

244.  The foregoing provisions of the Act currently burden and will

continue to burden Plaintiff Coons' liberty and privacy interests, as well as his

quasi-sovereign interest in freely exercising his legislative power of initiative and

referendum by denying and/or diminishing their otherwise lawful scope and

effectiveness.

245.  The foregoing provisions of the Act injure Plaintiff Coons with

current and/or threatened economic harm, the inevitability of which is patent.  *See,*

*e.g., Okpalobi*, 190 F.3d at 350.

246.  The foregoing provisions of the Act currently burden and will continue to burden State Legislator Plaintiffs and other state legislators' liberty and quasi-sovereign interests in legislative voting, as well as their state constitutional voting duties by contributing to the diminishment of their otherwise lawful scope and effectiveness.

247.  The foregoing provisions of the Act currently burden and will continue to burden Plaintiffs Flake, Franks and Shadegg and other federal legislators' liberty and quasi-sovereign interests in legislative voting, as well as their constitutional voting duties by contributing to the diminishment of their otherwise lawful scope and effectiveness.

248.  The foregoing provisions of the Act are currently causing actual and well-founded worry, fear, and anguish to Plaintiffs.

## Count X

### The Act Violates the Tenth Amendment

249.  Plaintiffs reallege, adopt and incorporate by reference paragraphs 1 through 248 above as though fully set forth herein.

250.  By expressly reserving powers to the States or the people, the Tenth Amendment substantively reinforces the letter and spirit of the Constitution by prohibiting any constitutional interpretation of the Necessary and Proper Clause, or any other clause, that could impliedly consolidate all governmental power in

the federal government or otherwise render States political non-entities.  *Printz*, 521 U.S. at 923-24 (citing THE FEDERALIST NO. 33 (Alexander Hamilton); Gary Lawson & Patricia B. Granger, *The "Proper" Scope of Federal Power: A Jurisdictional Interpretation of the Sweeping Clause*, 43 Duke L.J. 267, 297-326, 330-33 (1993)).

251.  The Tenth Amendment further confirms that under our Constitution the federal government is one of enumerated, and hence limited, powers: "The powers delegated by the . . . Constitution to the federal government are few and defined.  Those which are to remain in the State governments are numerous and indefinite."  THE FEDERALIST NO. 45 (James Madison).

252.  The foregoing provisions of the Act violate principles of state sovereignty guaranteed by the Tenth Amendment by:

(A) interfering with Arizona's sovereign power to protect individual liberty through the Health Care Freedom Public Policy and Health Care Freedom Act (upon its enactment);

(B) co-opting control over Arizona's budgetary processes and legislative agendas;

(C) usurping Arizona's exclusive police, taxing and spending authority, including the exclusive authority to regulate intrastate, non-economic inactivity and to levy direct, unapportioned taxes;

(D) burdening the voting powers of State Legislator Plaintiffs and other state legislators;

(E) burdening the voting powers of Plaintiff Nick Coons, and other Arizonans, under their state constitutional power of initiative and referendum;

(F) commandeering officials and departments of the State of Arizona; and,

(G) effectively dissolving the vertical separation of powers between the federal and state governments and effectively displacing an area of regulation traditionally entrusted to the States' police power.

253.  State officials do not have the constitutional power to surrender Arizona's sovereignty in the foregoing ways in exchange for federal funds because the guarantee of state sovereignty under the Tenth Amendment exists to protect the people, as much as it exists to preserve the prerogatives of the State. *Cf. New York*, 505 U.S. at 182 ("[W]here Congress exceeds its authority relative to the States . . . the departure cannot be ratified by the 'consent' of state officials").

254.  By attempting to induce Arizona state officials to blindly surrender state sovereignty in the foregoing ways in exchange for federal funds, the Act wrongfully, coercively, unconscionably and unconstitutionally seeks to induce state officials to abandon federalist structures they have no power to abandon.

255.  Congress can no more claim the constitutional power to induce Arizona to comply with the Act's mandates in exchange for federal funding, than it could induce Arizona to sell one of its Constitutionally-guaranteed senatorial seats in exchange for federal funding.

256.  The power to enact the foregoing provisions of the Act was not delegated to Congress under the Constitution.  Consequently, the power to enact such legislation, if any, is exclusively reserved to the States or to the people under the Tenth Amendment.

257.  The foregoing provisions of the Act currently burden and will continue to burden Plaintiff Coons' liberty and privacy interests, as well as his quasi-sovereign interest in freely exercising his legislative power of initiative and referendum by denying and/or diminishing their otherwise lawful scope and effectiveness.

258.  The foregoing provisions of the Act injure Plaintiff Coons with current and/or threatened economic harm, the inevitability of which is patent.  *See, e.g., Okpalobi*, 190 F.3d at 350 (5th Cir. 1999).

259.  The foregoing provisions of the Act currently burden and will continue to burden State Legislator Plaintiffs and other state legislators' liberty and quasi-sovereign interests in legislative voting, as well as their state constitutional voting duties by contributing to the diminishment of their otherwise lawful scope and effectiveness.

260.  The foregoing provisions of the Act currently burden and will continue to burden Plaintiffs Flake, Franks and Shadegg and other legislators' liberty and quasi-sovereign interests in legislative voting, as well as their

constitutional voting duties by contributing to the diminishment of their otherwise lawful scope and effectiveness.

261.  The foregoing provisions of the Act are currently causing actual and well-founded worry, fear, and anguish to Plaintiffs.

262.  The foregoing provisions of the Act cause and will continue to cause irreparable harm to Plaintiffs by violating the Tenth Amendment to the U.S. Constitution.

## **Alternative Count XI**

### **Non-Preemption**

263.  Plaintiffs reallege, adopt and incorporate by reference paragraphs 1 through 262 above as though fully set forth herein.

264.  The Act does not expressly preempt Arizona's laws or constitutional provisions, such as the Health Care Freedom Public Policy or the forthcoming Health Care Freedom Act.

265.  Section 1555 of the Act expressly states:

No individual, company, business, nonprofit entity, or health insurance issuer offering group or individual health insurance coverage shall be required to participate in any Federal health insurance program created under this Act (or any amendments made by this Act), or in any Federal health insurance program expanded by this Act (or any such amendments), and there shall be no penalty or fine imposed upon any such issuer for choosing not to participate in such programs.

266.  Accordingly, significant federalism interests would be implicated and serious concerns about the Act's constitutionality would arise, if the Act's individual, employer and health exchange mandates, and related penalties and regulations, were construed as preempting the Health Care Freedom Public Policy and the Health Care Freedom Act (if enacted).

267.  In the alternative to the allegations supporting the constitutional causes of action advanced in the preceding paragraphs, the Act does not clearly, directly and unequivocally override state laws or constitutional provisions, such as the Health Care Freedom Public Policy or the forthcoming Health Care Freedom Act.

268.  In the alternative to the allegations supporting the constitutional causes of action advanced in the preceding paragraphs, the Act should not be construed as preempting the Health Care Freedom Public Policy or the Health Care Freedom Act (upon its enactment).

269.  In the alternative to the allegations supporting the constitutional causes of action advanced in the preceding paragraphs, the Act should be construed as deferring to the Health Care Freedom Public Policy or the  Health Care Freedom Act (upon its enactment), as legitimate exercises of the State of Arizona's exclusive Tenth Amendment police, taxing and spending authority in accordance with the structural purpose of the American system of federalism,

1
2
3

which requires the preservation of individual liberty by diffusing the concentration

4   of power.

5        270.  The individual, consumer, administrative, employer and health

6   exchange mandates, and related penalties and regulations, including the

7

8   recommendations and proposals of IPAB, should be regarded as unenforceable as

9   applied within the boundaries of the State of Arizona to the extent they interfere

10

11   with the freedom protected by the Health Care Freedom Public Policy and the

Health Care Freedom Act (upon its enactment).

12                              **REQUEST FOR RELIEF**

13

14        271.  For all of the foregoing reasons, Defendants are without lawful

15   authority and/or are acting in violation of the United States Constitution by

16   enforcing and threatening to continue to enforce the individual, consumer,

17

18   administrative, employer, health exchange and Medicaid eligibility and

19   maintenance of effort mandates of the Act, as well as any related penalties and

20   regulatory authority, including the establishment, recommendations and proposals

21

22   of IPAB.

23        272.  Plaintiffs have no adequate legal, administrative, or other remedy by

24   which to prevent or minimize the continuing and/or threatened irreparable harm

25

26   from Defendants' current and threatened enforcement of the foregoing provisions

27   of the Act.

28

273.  An actual live controversy exists between Plaintiffs and Defendants, in which the parties have genuine and opposing interests, interests that are direct and substantial, and of which a judicial determination will be final and conclusive.

274.  Plaintiffs have a likelihood of success on the merits of their claims.

275.  The public interest and equities favor entry of a court order granting Plaintiffs the following described declaratory relief, as well as temporary, preliminary and permanent injunctive relief.

**WHEREFORE**, Plaintiffs respectfully request that the Court:

A. Declare the Act to be in violation of the United States Constitution both facially and as applied to Plaintiffs and others similarly situated; or, alternatively, declare that the Act does not preempt the Health Care Freedom Public Policy or the forthcoming Health Care Freedom Act, and the Act's individual, consumer, administrative employer and health exchange mandates, and related penalties and regulations, including the establishment, recommendations and proposals of IPAB, are not enforceable within the boundaries of the State of Arizona.

B. Declare Defendants are acting in violation of the Constitution by enforcing and threatening to continue to enforce the Act against Plaintiffs and others similarly situated; or, alternatively, declaring Defendants are acting unlawfully by enforcing and threatening to continue to enforce the Act's individual, consumer, employer and health exchange mandates, and related

penalties and regulations, including the establishment, recommendations and proposals of IPAB, within the boundaries of the State of Arizona;

     C. Enjoin Defendants and any other agency or employee acting on behalf of the United States from enforcing the Act against Plaintiffs, and others similarly situated; or, alternatively, enjoining Defendants and any other agency or employee acting on behalf of the United States from enforcing the Act's individual, consumer, employer and health exchange mandates, and related penalties and regulations, including the establishment, recommendations and proposals of IPAB, within the boundaries of the State of Arizona; and

     D. Award Plaintiffs their reasonable attorneys' fees, litigation expenses and costs, pursuant to 28 U.S.C. § 2412 and 42 U.S.C. § 1988, and other applicable law, and grant such other relief as the Court may deem just and proper.

**August 12, 2010**

                **RESPECTFULLY SUBMITTED**,

<u>s/ Clint Bolick</u>
Clint Bolick (Ariz. Bar No. 021684)
Diane S. Cohen (Ariz. Bar No. 027791)
Nicholas C. Dranias (Ariz. Bar No. 330033)
Gustavo E. Schneider (Ariz. Bar No. 027213)
GOLDWATER INSTITUTE
500 E. Coronado Rd., Phoenix, AZ 85004
P: (602) 462-5000 / F: (602) 256-7045
CBolick@GoldwaterInstitute.org
DCohen@GoldwaterInstitute.org
NDranias@GoldwaterInstitute.org
GSchneider@GoldwaterInstitute.org
*Attorneys for Plaintiffs*